Peck, J.
(dissenting) delivered the following opinion: Out of the many objections made, to the sufficiency of the proceedings against the prisoner, to justify his execution, I shall notice two; 1st, the question made by the bill of exceptions, on the admission of the declarations of M’Callahan at Carter’s, as proved by Carter the witness, about two hours before the homicide. M’Callahan and the prisoner, being together, called for whiskey, divided it between them, touched glasses and drank. M’Callahan askfed for the deceased and drew his knife, said there was but one man in the world he had any enmity against, and expressed the idea (in rude and profane language,) that he would be revenged. M’Callahan said, come let us go, and the two departed. Was this legal evidence, as a circumstance to show a previous concert between prisoner and M’Callahan, to commit the murder? The court overruled the objection and admitted the evidence.
This point being spoken upon with great confidence on the part of the prosecutor, as well as on the side of the defendant, it has been examined with solicitude. Trials for treason, as given in the English books, are well calculated to lead the mind astray from the question in other cases. In treason, words of intention are evidence of the crime, because the crime maybe committed by merely intending the death of the king, or the overthrow' of his government. Cornwell and M’Callahan may have intended to commit the *160 murder, two hours before its perpetration by Cornwell; but they are not indicted for a crime, consisting of intention alone. It is for an act committed. If the conspiracy existed before the act, was it not urged in the commission of the crime? If to be used at all, then the words would be signs, creating a circumstance in the case, which might heighten the crime to murder; whereas, without the words as proof of malice, it would be only manslaughter. But M’Callahan, at the time this evidence was received, stood acquitted of the charge altogether. That circumstance made him a competent witness, to prove what was the intention of the prisoner at the time M’Callahan used the threat proved by Carter.
Circumstantial evidence is not admissible, where the case is susceptible of positive proof of the fact in the power of the party. The presumption attempted to be raised, is, that M’Callahan and Cornwell had one mind touching the enterprise. Therefore, the whole fact, if it was so, could have been made out by positive proof, by calling M’Callahan to the point. Being governed by the rule, that the best evidence shall be adhered to in all cases, and heretbeing better evidence behind the proof offered, was, in my opinion, inadmissible. The declarations of a person, who might have been produced as a witness, are inadmissible. (11 John. Rep. 185.) But let us take another view of the question. One circumstance may be used to rebut another. Corn-well said nothing; the words were used by M’Callahan. They are jointly charged in this indictment, and M’Callahan is acquitted. Has the circumstance any foundation in fact to rest upon? If the previous declaration weighed with the judge, ought it not to have been balanced by the other fact — the acquittal of him who made it? Surely, if the threat of M’Callahan, who was present at the homicide, weighed nothing in Ms case, it ought to have weighed less in the case of him who made no threat. Say, for the sake of argument, that M’Callahan was particeps in the crime, and that in giving this evidence he would have accused himself, and therefore could not be compelled to answer. To this it maybe replied, that he stood acquitted- *161 and, by the constitution, was shielded from being called to answer a second time. Being, therefore, released from liability, and his interest at an end, none but himself could make the objection,, even if he could. (Phil. Ev. 223.) Is this hearsay evidence? Carter proves what he heard M’Callahan say (not what the prisoner was heard to say,) some time before the homicide. On authority then, how is the question settled? There is no act ^et done, therefore the threat is no part of the res gesta; and the furthest the books go.on the subject is, to authorize hearsay evidence when it makes part of the thing done. (Phil. Ev. 218.) What a dying person says, may also, in some specified cases, be received. What a dying accomplice has been heard to say, in the immediate prospect of death, has been received against the principal felon. But this is admitted on the sole ground, that the awful condition of the dying man, gave to his declaration all the solemnity of an oath; (Phil. 217.) and this is conclusive to show what the rule of law is. Its being admitted only on the principle, that he acts as on oath, proves that, were he living, nothing short of his oath would be received. A late writer on evidence, in commenting on the rule res inter alios, uses this strong language: “that no man shall be concluded, or even prejudiced, by the acts, declarations or conduct of strangers, as it is founded in the most simple principles of natural justice, has ever been regarded by the law as sacred and inviolable. Every man, as a moral agent, is accountable for his own acts.” (3 Starkie 1300.)
Why should the prisoner have spoken at the time of the threat by M’Callahan? M’Callahan did not addresss him, did not accuse or implicate him. From any thing the prisoner said, from any thing he acted or looked, if I may so speak, may it not as well be intended that he went, when leaving Carter’s, rather to prevent M’Callahan, than to commit the crime himself? For whatever bad feelings had once existed between deceased and prisoner, if we believe the evidence, had been removed. But by an arbitrary law of the'mind, because the homicide was after the scene at Carter’s, there is given to it an expost-facto criminality against *162 the intendment of law, that a man should rather be presumed innocent than guilty. Had there been no homicide committed, who would have dreamed that the prisoner had even a wicked intention that night?
But there is another consideration. Even if it was conceded, that the evidence was rightfully received, should not the judge, either at the time of admitting it, or in giving his charge to the jury, have left it to them to apply or reject, according as their minds were satisfied or not satisfied, with the proof of combination? The judge, because his mind was satisfied, let in the proof. Is that conclusive? and if not observed upon by the judge, are not the jury to take it from him as conclusive? and if so to receive it, is it notan opinion expressed-by the judge on the fact? This may be esteemed a new consideration, but if it is so, it naturally arises out of the constitution; for the same principle, which forbids the judge from charging on the fact, establishes the caution I am now going to insist upon. This is a fit case to illustrate the principle: let us see how it will operate. Without the circumstances judged of by the court, which, if offered for any thing, was to show malice, the crime might possibly have been reduced to manslaughter. But the judge has weighed and admitted it without any qualification; is he not then the sole arbiter of the fate and life of the prisoner? If so, the jury is useless. On this point, I am not without authority. In Fields and Webber vs. the state, Peck 142, the court gave an express opinion, that the evidence shall be cautiously received, and shall be accompanied with such observations as legally characterize it. All the books characterize presumptive evidence. It is admissible, and may justify conviction, but it is received with caution, and is least to be trusted, for at best it is one thing proved from which the mind supposes the existence of another thing. (Norris Peake 45; Swift 136.
Secondly; the caption to this indictment will not, on authority, in my opinion, justify any judgment on these proceedings.
There is no place shown in the record, except in the county of Davidson, where the grand jury were called to *163 gether, sworn and charged, or found the indictment. The bill was found in May. At the November term following, the court met at the court house in Nashville, and there tried the prisoner. It may be inferred, that they met at the court house in Nashville in May; but the record ought to have said so; and for the want of this, see 1 Chitty Crim. Law 329; 3 Bac. Abr. Indictment I. The caption, after naming the judge, does not say, “assigned to hold, &c.” This is fatal; (3 Bac. Abr. 572, Indictment; 1 Chi. Cr. Law 332; 1 Saun. 263.) It does not show where, nor by what authority, the jurors were called. (Peck's Rep. 166, 310.) The venire facias, at the end of the record, is improperly there. It is no part of this record. When, or how, it got into the office, does not appear. The case of Lusk vs. the state, as it has been reported to me, is directly in point. There the affidavit used bn the motion for a new trial, although on the file, would not be heard in the court above, because not made part of the record by the bill of exceptions, and the man was executed. The rule will, in this case, work as strongly in favor of life, as it did in the other case against it.
So far my remarks apply to the caption, as'first presented by the record on which the errors were assigned. But a certiorari having been sent, and a more perfect record being now before us, I am still of opinion, that these objections lie to the captions, viz. 1. That it does not appear, that the judge, ffm. E. Kennedy, was assigned to hold the court; and second, it does not appear that the jurors were “then and there sworn.” Both these will be now considered.
In the late American edition of Comyn's Digest, vol. 4, p. 672, title Indictment, in note (h) 1, the form, authorities and reasons for strictness, are brought together and considered. The caption, according to this author, consists of seven parts, each of which has its office. 1. The county, where the indictment is taken, that we may know by the proof that the offence was there to be tried. 2. The court before whom taken, that it may be seen there was competent authority in the court. 3. The place where the court was *164 holden: if the statute requires the court to be holden at a. place, that place must be named, or the omission will vitiate. 4. The time of holding the court-, and in stating the time, if inconsistent or impossible dates are introduced, it will be fatal. 5. The members of the court, and that they were assigned to the duty. 6. The jurors, who must be of the county, and then and there sworn. And, 7. The fact, whatever,it maybe, is presented.
The application of some of these rules to our circuit courts will show, that as much strictness is required under our policy, as under the policy pursued in Great Britain. Some courts there are constituted for the crown for special purposes, and the commission specifies the authority, as “to inquire of all felonies, &c.” Courts here, though acting under a general commission, do not, at all their sessions, have the same powers. The legislature, by sundry acts, authorizes and orders special courts, special terms of courts, for the trial of civil causes; special terms for the trial of civil and criminal causes, and special terms for the trial of criminal causes only. It also authorizes interchanges of judges to hold the courts of whole circuits, and of circuit courts of counties or parts of circuits. These propositions naturally draw the mind to the conclusion, that all circuit judges, holding circuit courts, have equal powers. Sometimes the power extends only to a course of civil proceedings; so that if inference could be resorted to, on general principles, to presume from the general power, that all the circuit judges are judges of the state, that presumption is met by the special authorities referred to.
The forms long established become the law, and ought not to be departed from, even in civil proceedings where left to the court alone. The legislature may dispense with them, it is true, except where the constitution forbids it, and when done, it should be by express provision, not by an inference deduceable from an act of the legislature; and this remark should apply, in an especial manner, to criminal, proceedings. This idea gains strength, from the provisions of the constitution, copied from Magna Charta, that “no freeman shall be put to answer any criming! charge, *165 but by presentment, indictment or impeachment,” and that “his trial shall be by an impartial jury of the county, district, in which the crime shall have been committed.” How these provisions have been understood in that country, where, though liberty is regarded, yet not in a higher degree than with us, will be seen by the rules established and adhered to, from remote antiquity down to the present time, as well in times of heat, when the crown seemed to demand vengeance, as when no fervor excited prosecutions. Our policy, so far from discarding the principle, has embraced it in every case where it has been presented and pressed to the court. One reason obviously is, that often the duty is limited and expired.
But precedents are resorted to, for the purpose of showing, that persons have been executed, where captions, tested by the. foregoing rules, are found defective. Though nothing in the record, or reported case, shows that the objection was noticed or urged, precedents against law are never admitted, on a principle too plain to require its being stated; that reason and truth (and law is founded in both,) are safer guides than error or falsehood. I will not say, that the prisoners in these cases waved the objection, for they are supposed to wave nothing; and if disposed to do so, I question whether the court ought to have permitted it. Suffer me to say — and I think it a full answer to the argument of precedent — that all it proves is, that the course of the court has been both ways; the law is on the one or the other side of the question; I think I have shown it to be with me, and in all the late cases it has been so followed. Thus law, and the modern authority of this court, sanctioned my opinion. Do I say too much, when I suggest, that in this country legal science has been on her march to higher eminence, through the industry of an enlightened bar, and the labors of one now no more; who first gave impetus to a doctrine at once safe, because legal — (being based on the constitution,) merciful, because it does not sanction execution without form — and just, because the state, by her officers, should not be permitted to slumber, and make that the pretext for *166 departure from the certainty required at her hands, in a cage afJeCting life?
If I could doubt, on the score of our system and policy being in some respects different from those of the country whence we derived our common law, that doubt would be wholly removed, when I should find myself supported by such a man as judge Kent of New York. That judge has viewed the subject, and has given the opinion of the whole court— that in a caption, stating that the grand jury were sworn and charged, the omitting of the words then and there, was fatal after verdict, and-the judgment was arrested. What adds strength to this case, is the consideration that it was not a capital case, being for extortion. All the cases, ancient and modern, were considered, and the modern conflicting with the principles there established, overruled, because against law. (People vs. Guernsey, 3 John. Cases 265.)
But it is assumed, that in North Carolina, in the case of the state vs. Warden, for perjury, the caption was dispensed with altogether; (2 Taylor's Rep. 163,) and this partly on the ground, that an act of assembly dispensed with the form, and partly on the false premises, that a court of general jurisdiction can judicially be known as such. In three subsequent cases, however, (State vs. Sutton, 6 Mur. Rep. 281; state vs. Strect, Id. 156; and state vs. Haddock, 2 Hawk. Rep. 471,) it was otherwise decided, and the correct rule restored. The arguments used in the state vs. Warden, viz: that the circuit courts are courts of general jurisdiction, and that we are judicially bound to know their powers, fall at once to the ground, when we find it to be express law, as applicable to the court of king’s bench in England, that all this strictness in captions shall be observed (4 Bl. Com. 266,) as to the power of the court, and (4 Chitty Crim. Law 194, 1 do. 328,) as to the form. So of the quarter sessions in England, (4 Bl. Com. 271,) which is a court of as general jurisdiction as our circuit courts in criminal cases. In Andrews 178, 3 Sol. R. 138, the reason for this strictness is given, “that we may see the court had jurisdiction, and proceeded regularly.” (4 Com. Dig. Am. ed. 572.) Let us apply the reason here given, to the case be *167 fore the court. I am told that, judicially, I am to know the judge of the circuit where this indictment is taken. .Tn-dicially, then, I am to know, that Thomas Stuart is the judge. Then let me ask, how am I to know, that William E. Kennedy is the j udge of the same circuit? If I am told that he may interchange ridings with the judge of that circuit, then I answer, this record does not show that he did so. I cannot suppose it, for that would be, to proceed alone by intendment. How can I judicially know, that an understanding with judge Stuart, privately made in pais, gave to judge Kennedy the authority to take this indictment? So far from it, I cannot even judicially know judge Stuart to be the judge: and it is obvious, that without its being shown on the record, I cannot know judge Kennedy as having the authority assumed. I add, further, on this subject, that even in civil proceedings, I cannot judicially know the judges of any other court, than that to which I belong, further than I learn from the record. Andrews 74, Str. 1226, 2 Saun. Rep. 175, note 2, are express authorities to prove the position. (Chitty on Pl. 225.)
Washington and Craighead for appellant.
A. Hays (attorney general), for the state.
I give no opinion on the guilt or innocence .of the prisoner. My authorities and reasoning only show, that he, and all such as are placed in his condition, should be remanded for a trial, where form and substance shall be pursued. It is my business to arrest the stroke of the. sword, until the victim shall be brought to the altar prepared.